**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MONDELĒZ GLOBAL LLC,** | **Case No.** |
| **Plaintiff,** | |
| **vs.** | |
| **ASSOCIATED MILK PRODUCERS INC.** | |
| **Defendant.** | |

**COMPLAINT**

Plaintiff Mondelēz Global LLC ("MDLZ"), by and through its undersigned attorneys, Jenner & Block, LLP, hereby sets forth its Complaint against Defendant Associated Milk Producers Inc. ("AMPI"), and states as follows:

**INTRODUCTION**

1.     This lawsuit concerns whey powder that AMPI supplied for use in MDLZ's snack food products, which AMPI recalled because it identified an issue involving Salmonella contamination, a dangerous pathogen that can cause serious illness or death. As a result of AMPI's tainted whey powder, MDLZ was forced to institute a costly nationwide recall of snack food products that it sells under the RITZ brand name. MDLZ undertook this recall to protect the health and safety of the public after being notified by AMPI that it had detected the presence of Salmonella in its whey powder and that a "recall should be carried out to all potentially impacted levels" in order "to prevent consumer illness." As a direct consequence of this recall, MDLZ incurred damages of at least approximately $25 million. MDLZ's damages resulting from the recall include at least the following: (a) the value of the RITZ products that needed to be recalled; (b) lost profits on the sale of RITZ products due to the recall; (c) incremental expenses incurred in implementing the recall (including costs of labor, product destruction, and customer fines); and

1

(d) incremental marketing and public relations expenses incurred to restore consumer confidence in the RITZ brand and mitigate the damage to the brand. MDLZ now brings suit against AMPI to recover the damages caused by AMPI supplying MDLZ with Salmonella contaminated whey powder.

## PARTIES

2.      MDLZ is a limited liability company organized under the laws of the State of Delaware. MDLZ is a wholly owned subsidiary of Mondelēz International, Inc., one of the world's largest producers of snack foods such as crackers and cookies. Mondelēz International, Inc. is a corporation organized under the laws of the State of Virginia. MDLZ and Mondelēz International, Inc. maintain their principal business offices in Chicago, Illinois.

3.      On information and belief, AMPI is a corporation organized under the laws of the State of Kansas. AMPI is a dairy marketing cooperative whose members produce dairy products, including dry whey powder. AMPI maintains its principal business office in New Ulm, Minnesota.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states, and the amount in controversy exceeds the sum or value of $75,000.

5.      AMPI consented to venue and personal jurisdiction in the Northern District of Illinois in connection with its supply of products for MDLZ by virtue of the forum selection clause in the terms and conditions attached to orders for the purchase of whey powder that were placed by MDLZ and accepted by AMPI. (*See* Exhibit 1 ¶ 8.)

6.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because AMPI is a corporation and has sufficient contacts to subject it to personal jurisdiction in the Northern District

of Illinois and therefore resides in this district, and because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## FACTS

### MDLZ's Production of RITZ Products and Relationship with AMPI

7.      MDLZ produces a wide array of snack food products, including the many cracker products in the RITZ brand.

8.      RITZ is a large, 85-year-old brand popular with consumers.  The brand has become synonymous with the cracker category over its lifetime.  RITZ has a long and trusted history with families, which represent a significant portion of volume for the brand.

9.      One of the ingredients in many RITZ products is whey powder, which is incorporated into the cheese filling in RITZ Cracker Sandwiches and RITZ Bits Sandwiches (collectively, the "RITZ products").

10.     During the relevant period, MDLZ produced the RITZ products at its own bakery in Atlanta, Georgia, and through external manufacturers with which MDLZ contracted to produce the RITZ products for MDLZ in accordance with MDLZ's specifications.

11.     When MDLZ uses external manufacturers to produce its products, MDLZ typically specifies both the ingredients that its external manufacturers must use and the specific suppliers pre-approved by MDLZ from which the external manufacturers must purchase those ingredients. MDLZ's external manufacturers purchase those ingredients at the prices set by MDLZ and the supplier.

12.     MDLZ's external manufacturers are contractually obligated to purchase ingredients from the suppliers that MDLZ selects.

13.     MDLZ selected AMPI to be the supplier of the whey powder used in the RITZ

products it produces at its Atlanta bakery, and directed its external manufacturers to purchase whey powder from AMPI for use in MDLZ's RITZ products. MDLZ's external manufacturers purchased the whey powder involved in this recall at the pricing set by MDLZ and AMPI.

14.     AMPI produced the whey powder for MDLZ at AMPI's plant in Blair, Wisconsin.

15.     Any supplier that produces ingredients for use in MDLZ products must be approved by MDLZ. To be approved to supply whey powder to MDLZ and its external manufacturers for use in MDLZ's RITZ products, AMPI was required to undergo a rigorous qualification process that included audits of AMPI's manufacturing facility. As part of the qualification process, AMPI agreed that it would comply with MDLZ's Supplier Quality Expectations Manual ("SQE Manual"). The SQE Manual is a 47-page document that sets forth detailed requirements with which all suppliers for MDLZ must comply.

16.     MDLZ (or its predecessor Kraft Foods) approved AMPI to be the supplier of whey powder for MDLZ's products, and AMPI remained qualified by MDLZ until the whey powder recall occurred. AMPI agreed to meet MDLZ's specifications and quality requirements (such as the SQE Manual) for all whey powder supplied to MDLZ or its external manufacturers.

17.     AMPI was aware that it was a MDLZ-approved supplier of whey powder—approved for purposes of both whey powder orders issued by MDLZ itself and orders issued by MDLZ's external manufacturers, who were directed by MDLZ to order the ingredient from AMPI for use in manufacturing MDLZ's products. Each order placed by MDLZ or its external manufacturers was subject to MDLZ's specifications and quality requirements as well as the pricing set by MDLZ and AMPI.

18.     In addition to the initial approval suppliers must obtain from MDLZ, suppliers are subject to "on-site periodic" audits known as Supplier Food Safety Assessments. Supplier Food

Safety Assessments are performed by MDLZ personnel or third-party auditors on MDLZ's behalf. Each Supplier Food Safety Assessment "evaluate[s] key food safety programs," and unacceptable audit findings can lead to MDLZ withdrawing approval and discontinuing its use of that supplier as a source.

19.     MDLZ last conducted a Supplier Food Safety Assessment of AMPI's Blair plant in June 2015. As noted in the Supplier Food Safety Assessment Visit Report that MDLZ prepared, "[t]he main objective of the visit" was "to carry out a microbiological food safety assessment" of the AMPI plant. "The primary focus was to measure the plant's compliance to [the] Mondelēz International Supplier Quality Expectations (SQE) manual."

20.     In accordance with MDLZ's SQE Manual—with which AMPI agreed to comply— AMPI was obligated to "implement[] a written Quality Management System to ensure that the material produced conforms to [MDLZ's] specific requirements." AMPI's Quality Management System was required, among other things, to "ensure compliance with the [SQE Manual], Mondelēz Global LLC['s] Supplier and External Manufacturer HACCP[1] Manual, [Mondelēz's] Specifications for the specific product, and all applicable regulatory requirements of the production country."

21.     The SQE Manual sets forth detailed requirements that AMPI agreed to follow in order to guarantee "the safety and quality of [MDLZ's] products" by "ensur[ing] that [AMPI's] own food safety and quality systems meet Mondelēz Global and industry standards." The SQE Manual contains requirements pertaining to more than two dozen areas of food safety and quality, including personnel training, employee illness and communicable disease, sanitation programs, pathogen environmental monitoring, hold and release, and specification compliance.

---

[1] "HACCP" stands for Hazard Analysis Critical Control Point.

5

22.     The SQE Manual requires suppliers of ingredients that will be used in the manufacture or sale of products in the United States to provide a Continuing Pure Food Guarantee to MDLZ stating that those ingredients will comply with the Federal Food, Drug, and Cosmetic Act and related requirements.

23.     The SQE Manual provides that each MDLZ supplier "shall ensure that [MDLZ's] Specifications are implemented at the production location . . . . The Supplier must deliver materials that meet these Specifications."

24.     MDLZ has a detailed specification for whey powder with which both AMPI and MDLZ's external manufacturers were required to comply (hereinafter, the "MDLZ specification"). A copy of the MDLZ specification for whey powder supplied by AMPI is attached as Exhibit 2. The MDLZ specification lists AMPI as a supplier of whey powder for MDLZ. (Exhibit 2 at 10–11.)

25.     The MDLZ specification provides that "[a]ll goods must comply with" the SQE Manual. (*Id.* at 1.)

26.     The MDLZ specification further requires that, for each lot of whey powder, the supplier must conduct microbiological testing for Salmonella and other pathogens, and provide a Certificate of Analysis ("COA") showing the sample tested negative. (*Id.* at 8.) Pursuant to the SQE Manual, if a COA is required for a particular ingredient, the testing must be performed by a laboratory approved by MDLZ, and the testing "must be based on protocols/methods that have been approved and agreed by technical experts within Mondelēz[.]" Testing for AMPI's whey powder was conducted by Cherney Labs—a MDLZ-approved testing lab.

27.     In addition to the MDLZ specification, which AMPI agreed to follow, AMPI provided MDLZ with AMPI's own specification for its whey powder product (hereinafter, the

"AMPI specification"). The AMPI specification was specifically referenced in MDLZ's own specification. (*Id.* at 10.) A copy of the AMPI specification is attached as Exhibit 3.

28. In the AMPI specification, AMPI warranted, among other things, that "[t]his product conforms to the USDA Standards for Extra Grade Dry Sweet Whey in 7 CFR § 58.813, the Standards of Identity in 21 CFR § 184.1979, and complies with FDA's Good Manufacturing Practices in 21 CFR § 110." (Exhibit 3 at 1.) Further, the AMPI specification indicates that its whey powder will be subject to microbiological testing to ensure the product is negative for Salmonella. (*Id.*)

29. For each lot of whey powder that AMPI delivered for use in MDLZ's products, AMPI provided a COA—either to MDLZ or to the external manufacturer that placed the whey powder order. Each such COA showed that the lot tested negative for Salmonella, in accordance with both the MDLZ specification and the AMPI specification requiring a negative test result.

***MDLZ and Its External Manufacturer, Hearthside Food Solutions, LLC***

30. One of the external manufacturers MDLZ used to produce the RITZ products was Hearthside Food Solutions, LLC ("HFS"). HFS manufactured the RITZ products for MDLZ at HFS's facilities in McComb, Ohio and London, Kentucky.

31. The Master Agreement between MDLZ and HFS provides that MDLZ "may name approved materials suppliers for any materials in the related Project Agreement, and [HFS] must buy those materials from them."

32. In the relevant Project Agreement between MDLZ and HFS, the Agreement lists whey powder ("DE Whey Formula 521") as an ingredient that HFS must purchase from MDLZ's approved supplier, AMPI. Under the Project Agreement, whey powder from AMPI is one of the many ingredients that HFS "will buy" and "will use to make [MDLZ's] Products."

33.     HFS ordered the whey powder from AMPI for use in MDLZ's RITZ products by issuing purchase orders to AMPI, an example of which is attached as Exhibit 4.  The purchase orders requested that AMPI supply whey powder that conformed with MDLZ's specifications and quality requirements and at the pricing set by MDLZ and AMPI.

34.     AMPI was aware of HFS's role as MDLZ's external manufacturer and was also aware that the whey powder HFS ordered from AMPI was to be used in manufacturing MDLZ's products, and thus was required to meet MDLZ's specifications and MDLZ's SQE Manual.

35.     The HFS-issued purchase orders to AMPI specifically identify the whey powder being ordered by an "Item Number"—4050006275800—that is the MDLZ SAP number for whey powder and is associated with the MDLZ specification.  (*See* Exhibit 4 at 1.)  HFS's purchase orders thus incorporate the MDLZ specification by referencing the MDLZ SAP number for whey powder.  In addition, the HFS purchase orders expressly refer to MDLZ by name, referring to "Mondelez HFS London Account # 100000227."  (*Id*.)

36.     The price listed in the HFS purchase orders is the price set by MDLZ and AMPI.  HFS does not independently negotiate with AMPI regarding the price of the whey powder, nor does HFS establish specifications or quality requirements.

37.     The HFS purchase orders also reiterate the requirement set forth in the MDLZ specification that AMPI must provide a "complete COA" for each delivery of whey powder.  (*Id.*)

38.     As reflected on HFS's purchase orders, AMPI billed HFS for the whey purchases by sending bills to HFS's business office in Downers Grove, Illinois.  (*Id.*)

39.     The HFS purchase orders attached a set of terms and conditions that provide a number of express warranties regarding the whey powder that AMPI supplied for use in MDLZ's RITZ products.  (*See id.* at 2.)

40.     Paragraph 4 of HFS's terms and conditions provides that AMPI "warrants all goods sold pursuant hereto as to workmanship, materials and design, and where applicable, as to conformance with drawings, specifications, samples or other descriptions." (*Id.* ¶ 4.)

41.     In Paragraph 10 of HFS's terms and conditions, AMPI further warranted that the whey powder was "(1) not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act and all amendments thereto, including but not limited to the Food Additive Amendment, (2) not articles which may not, under the provisions of Sections 401 or 505 of said Act, be introduced into Interstate commerce, (3) not adulterated or misbranded within the meaning of any pure food laws or ordinance (then in effect) of the state or city to which such article is shipped." (*Id.* ¶ 10.)

42.     AMPI also warranted that it "shall comply with all federal, state and local laws, executive orders and regulations." (*Id.* ¶ 16.)

43.     Pursuant to Paragraph 11 of HFS's terms and conditions, AMPI "agree[d] to indemnify and hold harmless [HFS] ***and [HFS's] customers*** from any and all claim, demands, damages or other injuries to persons or property in any way arising out of or resulting from the storage, purchase, consumption or use of goods covered by this [purchase] order." (*Id.* ¶ 11 (emphasis added)).

44.     In addition to the express warranties provided in HFS's terms and conditions, by operation of the Uniform Commercial Code, sales of whey powder by AMPI for use in MDLZ's products also incorporate the implied warranty of merchantability (U.C.C. § 2-314) and the implied warranty of fitness for a particular purpose (U.C.C. § 2-315).

45.     Like HFS, MDLZ also ordered whey powder from AMPI through purchase orders, an example of which is attached as Exhibit 1. MDLZ's purchase orders reflect that they were

issued from its former headquarters in Deerfield, Illinois. (Exhibit 1 at 1.)

46.     Each of MDLZ's purchase orders attached an identical set of terms and conditions. Paragraph 2 of those terms and conditions contains several express warranties regarding the quality of "all goods" to be delivered. (*See id.* ¶ 2.) Specifically, AMPI warranted that "all goods (including their packaging) and services will: (a) comply with [MDLZ's] specifications (or [AMPI's] specifications that [MDLZ] ha[s] approved); (b) be free of defects, made with new materials, and of good quality and workmanship; . . . and (f) be performed diligently and in a professional and workmanlike manner." (*Id.*)

47.     Paragraph 2 of MDLZ's terms and conditions also provides that AMPI "will ensure that [AMPI] and the goods and services comply with: (i) all applicable laws, regulations, and industry standards, and (ii) [MDLZ's] applicable Supplier Quality Expectations Manuals (including ingredient-specific requirements) . . . , which are made a part of this PO." (*Id.*) AMPI further warranted that its "employees, agents, and subcontractors comply with this PO." (*Id.*)

48.     Paragraph 6 of MDLZ's terms and conditions provides that AMPI will indemnify MDLZ for "any and all losses, damages, fines, penalties, and expenses (including reasonable legal fees) arising from third party claims resulting from actual or alleged breaches of this PO, negligent acts or omissions, or willful misconduct by [AMPI] or [AMPI's] employees, agents, or subcontractors." (*Id.* ¶ 6.)

49.     Paragraph 7 of MDLZ's terms and conditions requires that AMPI procure commercial general liability insurance covering AMPI's obligations under the purchase order, with MDLZ named as an additional insured. (*Id.* ¶ 7.)

50.     In addition to the express warranties provided in MDLZ's terms and conditions, by operation of the Uniform Commercial Code, sales of whey powder by AMPI also incorporate the

10

implied warranty of merchantability (U.C.C. § 2-314) and the implied warranty of fitness for a particular purpose (U.C.C. § 2-315).

***Salmonella Contamination of AMPI Whey Powder and Subsequent Recall***

51.     Salmonella is a type of bacteria that can cause illness in humans.   Individuals infected with Salmonella can develop diarrhea, fever, vomiting, and abdominal cramps ordinarily lasting four to seven days.   Salmonella infection can also result in severe illness or death, particularly in young children, frail or elderly people, or those with impaired immune systems.

52.     On July 16, 2018, AMPI sent a product recall notice to MDLZ, notifying MDLZ that AMPI had identified an issue related to the presence of Salmonella in whey powder produced at AMPI's Blair, Wisconsin plant.   A copy of AMPI's recall letter is attached as Exhibit 5.   AMPI also sent a similar letter to HFS for whey powder supplied to HFS for use in MDLZ's RITZ products.

53.     AMPI's letter provided a "listing of the lot numbers [MDLZ] received" containing the whey powder it was recalling due to the Salmonella issue.   The letter instructed MDLZ to "immediately examine [its] inventory and quarantine product subject to recall."   The letter further instructed: "This recall should be carried out to ***all potentially impacted levels***—wholesale, retail, consumer, [and] user. Your assistance is appreciated and ***necessary to prevent consumer illness***." (Emphases added.)

54.     Upon receipt of AMPI's recall notice, MDLZ immediately initiated its recall procedures.   Pursuant to these procedures, MDLZ must, among other things, trace the locations where impacted product is produced and cease production; determine the location of the finished products, both inside and outside of MDLZ's network; identify customers who may have received impacted products; cease distribution of any impacted product; and notify customers of the recall.

55.     To protect the health and safety of the public—MDLZ's number one priority—MDLZ determined that it needed to initiate a recall of any RITZ products that may have incorporated recalled whey powder from AMPI.

56.     After tracing where and when AMPI's recalled whey powder was used in its products, MDLZ determined that the recalled whey was incorporated into 16 types of RITZ products falling within specific "use by" dates.  Accordingly, on July 20, 2018, MDLZ announced a recall of these 16 types of RITZ products in certain specified "use by" date ranges (collectively, the "Recalled RITZ").

57.     The Recalled RITZ consisted of the following products:

| **PRODUCTS** | **SIZE/QUANTITY** |
| --- | --- |
| RITZ Bits Cheese Big Bag | 3 OZ |
| RITZ Bits Cheese | 1 OZ |
| RITZ Bits Cheese | 12 Pack Carton |
| RITZ Bits Cheese | 30 Pack Carton |
| RITZ Bits Cheese | 1.5 OZ |
| RITZ Bits Cheese | 3 OZ GO Packs |
| RITZ Cheese Cracker Sandwiches | 10.8 OZ |
| RITZ Cheese Cracker Sandwiches | 1.35 OZ |
| RITZ Bacon Cracker Sandwiches with Cheese | 10.8 OZ |
| RITZ Bacon Cracker Sandwiches with Cheese | 1.35 OZ |
| RITZ Whole Wheat Cracker Sandwiches with White Cheddar Cheese | 10.8 OZ |
| RITZ Whole Wheat Cracker Sandwiches with White Cheddar Cheese | 1.35 OZ |
| RITZ Everything Cracker Sandwiches with Cream Cheese | 10.8 OZ |
| RITZ Everything Crackers Sandwiches with Cream Cheese | 1.35 OZ |
| Mixed Cookie Cracker Variety | 20 Pack |
| Mixed Cookie Cracker Variety | 40 Pack |
| Christie RITZ Bits Sandwiches Cheese Flavoured | 180g |
| Christie RITZ Bits Sandwiches Pizza Flavoured | 180g |
| Christie Mini RITZ Bits Sandwiches Cheese Flavoured | 30 x 42 g |
| Christie Mini RITZ Bits Sandwiches Cheese Flavoured | 42 g |
| Christie RITZ Bits Sandwiches Cheese Flavoured | 180g 6 Snak Packs |

58.     In accordance with FDA regulations and MDLZ's recall procedures, MDLZ used the "use by" dates printed on the product packaging to demarcate the products subject to recall because the "use by" date gives MDLZ customers and end-consumers clear guidance as to what

product they must immediately dispose of. The "use by" dates also allow direct sales distribution representatives—the personnel MDLZ uses to pull impacted product from retail shelves—to quickly enter stores and remove product without looking for extraneous information, thereby eliminating inefficiencies and potential human error. In addition, the "use by" dates allow MDLZ to clearly communicate recall information through the media. Injecting more information such as plant location or production line into a recall notice can lead to confusion regarding what product is being recalled and, potentially, a consumer ingesting a dangerous product.

59. In total, the recall MDLZ undertook to protect the public from AMPI's Salmonella-contaminated whey powder impacted hundreds of thousands of units of RITZ product located at numerous repacking centers, distribution centers, and retail stores.

60. In response to the recall, MDLZ's customers either destroyed the Recalled RITZ themselves, or returned the recalled product to MDLZ and were compensated by MDLZ for that product in the form of a refund or credit. In many instances, MDLZ also paid additional fines or fees to customers for failing to supply product under the terms of MDLZ's contracts with its customers, intended to compensate for costs the customer incurred in connection with the recall. In addition, while MDLZ's recall announcement was limited to certain RITZ products in certain "use by" date ranges, many customers pulled non-Recalled RITZ products from their shelves, increasing the amount of MDLZ's fines or fees and lost sales.

61. The recall also impacted MDLZ's ability to supply, on a going forward basis, RITZ products that contain whey powder. To ensure the safety of the public, MDLZ reviewed its production processes and prepared for the restart of production of the Recalled RITZ product lines. This effort took time and resulted in a substantial "off shelf" period for Recalled RITZ products.

62. Due to the recall, customer confidence in the safety of the RITZ brand as a whole

declined.  Both the news media coverage and the social media discussion characterized the recall as a generic "RITZ" recall rather than a recall of specific RITZ products with specific "use by" dates.  Consumers do not typically distinguish between the various product lines when referring to the RITZ masterbrand.  Consequently, the AMPI recall decimated sales across the RITZ brand.

63.     On August 8, 2018, MDLZ sent a letter to AMPI notifying it that MDLZ had a damages claim arising from the recall and requesting assurances that AMPI would reimburse MDLZ for the damages incurred due to the recall.

64.     As a result of the damage AMPI caused to MDLZ's property and the resulting recall and inability to provide an adequate supply of Recalled RITZ products nationwide, MDLZ has incurred total damages of at least approximately $25 million.  These damages were incurred in at least the following categories:

a.     MDLZ was unable to sell the Recalled RITZ in its possession despite the fact that MDLZ had incurred substantial expenses to manufacture these products.

b.     MDLZ was required to compensate its customers in the form of refunds or credits for Recalled RITZ that had been purchased by those customers but needed to be destroyed or returned as a result of the recall.  In addition, some of MDLZ's customers charged MDLZ fees or fines to compensate for removing Recalled Ritz from their shelves.

c.     MDLZ incurred a variety of expenses to implement the recall, including expenses to communicate with its customers, to collect the Recalled RITZ from store shelves nationwide, and to ship, store, and destroy the Recalled RITZ that had been rendered unsaleable or was returned by customers.

d.     MDLZ suffered lost profits as a result of the damage to MDLZ's property, its inability to produce the Recalled RITZ products at its manufacturing facility and HFS's

manufacturing facility, and due to the fact that the property damage and recall depleted the nationwide supply of these products.

e.     MDLZ also suffered lost profits from the precipitous sales declines in *non*-Recalled RITZ product lines—such as RITZ Crackers Savory & RITZ Crackers Family Size—due to stores pulling *all* RITZ products from shelves and customer confidence in the safety of the RITZ brand as a whole declining as a result of the recall.

f.     MDLZ was forced to inject unplanned and unbudgeted spend into the otherwise healthy RITZ brand, including increased advertising, marketing, public relations, labor, and logistics costs, in order to restore consumer confidence in the RITZ brand as a whole and thereby mitigate the damage to the RITZ brand caused by the recall.

g.     Despite its attempts to mitigate the damage to the RITZ brand, MDLZ suffered damage to its reputation and to customer and consumer goodwill.

65.     AMPI also failed to fill certain purchase orders issued by MDLZ and HFS for whey powder for use in MDLZ's products, which required MDLZ to incur additional costs procuring substitute whey powder.

**CLAIMS**

**COUNT I**
**Breach of Express Warranties (U.C.C. § 2-313)**

66.     MDLZ repeats and realleges paragraphs 1 through 65 as if fully set forth herein.

67.     In connection with AMPI's supply of whey powder to MDLZ (both directly and through MDLZ's external manufacturer, HFS), AMPI made a number of express warranties upon which MDLZ relied in purchasing and using whey powder from AMPI, and in directing its external manufacturer, HFS, to do so.

68.     The express warranties that AMPI made directly to MDLZ include at least the

15

following:

a.       AMPI agreed to comply with MDLZ's SQE Manual and all requirements contained therein.

b.       Pursuant to the SQE Manual, AMPI "ensur[ed] that [its] own food safety and quality systems [would] meet Mondelēz Global and industry standards."

c.       Also pursuant to the SQE Manual, AMPI agreed to deliver materials that meet MDLZ's specifications.

d.       Also pursuant to the SQE Manual, AMPI agreed to guarantee that its whey powder would comply with the Federal Food, Drug, and Cosmetic Act and related requirements.

e.       Pursuant to the MDLZ whey powder specification, "[a]ll goods must comply with" the SQE Manual.  (*See* Exhibit 2 at 10–11.)

f.       Pursuant to the AMPI whey powder specification, AMPI warranted, among other things, that "[t]his product conforms to the USDA Standards for Extra Grade Dry Sweet Whey in 7 CFR § 58.813, the Standards of Identity in 21 CFR § 184.1979, and complies with FDA's Good Manufacturing Practices in 21 CFR § 110."  (Exhibit 3 at 1.)

g.       COAs provided by AMPI certified that each lot of whey powder delivered tested negative for Salmonella.

h.       Pursuant to Paragraph 2 of MDLZ's terms and conditions, AMPI warranted that "all goods (including their packaging) and services will: (a) comply with [MDLZ's] specifications (or [AMPI's] specifications that [MDLZ] ha[s] approved); (b) be free of defects, made with new materials, and of good quality and workmanship; . . . and (f) be performed diligently and in a professional and workmanlike manner."  (*See* Exhibit 1 ¶ 2.)

i.　　AMPI further warranted that it "will ensure that [AMPI] and the goods and services comply with: (i) all applicable laws, regulations, and industry standards, and (ii) [MDLZ's] applicable Supplier Quality Expectations Manuals (including ingredient-specific requirements) . . . , which are made a part of this PO."  (*Id.*)

69.　　MDLZ is also a third-party beneficiary of a number of warranties arising from HFS's terms and conditions, including:

a.　　Paragraph 4 of HFS's terms and conditions, which provides that AMPI "warrants all goods sold pursuant hereto as to workmanship, materials and design, and where applicable, as to conformance with drawings, specifications, samples or other descriptions."  (*See* Exhibit 4 ¶ 4.)

b.　　In Paragraph 10 of HFS's terms and conditions, AMPI further warranted that the whey powder was "(1) not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act and all amendments thereto, including but not limited to the Food Additive Amendment, (2) not articles which may not, under the provisions of Sections 401 or 505 of said Act, be introduced into Interstate commerce, (3) not adulterated or misbranded within the meaning of any pure food laws or ordinance (then in effect) of the state or city to which such article is shipped."  (*Id.* ¶ 10.)

c.　　In Paragraph 16 of HFS's terms and conditions, AMPI also warranted that it "shall comply with all federal, state and local laws, executive orders and regulations."  (*Id.* ¶ 16.)

70.　　MDLZ is a third-party beneficiary of the express warranties in the contracts between AMPI and HFS for the sale of whey powder to be used in MDLZ's products because AMPI entered into these contracts knowing and intending that the whey powder it supplied to HFS

would be used in products HFS was manufacturing for MDLZ.

71.     AMPI breached its express warranties to MDLZ by supplying whey powder for use in MDLZ's products that, among other things, was defective and needed to be recalled due to Salmonella contamination; did not meet MDLZ's specifications or comply with the SQE Manual; did not conform to USDA Standards for Extra Grade Dry Sweet Whey in 7 CFR § 58.813, the Standards of Identity in 21 CFR § 184.1979, and the FDA's Good Manufacturing Practices in 21 CFR § 110; was not "free of defects, . . . and of good quality"; and did not comply with all applicable regulations and industry standards.

72.     AMPI notified MDLZ of the defects in its whey powder and its recall, and MDLZ promptly notified AMPI that the recall had resulted in significant damages.

73.     As a direct and proximate result of AMPI's breach of its express warranties to MDLZ, MDLZ suffered significant damage, including but not limited to the damages associated with a nationwide recall to remove affected products.  These damages include at least the following: (a) the loss of damaged product that was still in MDLZ's plants and warehouses; (b) costs incurred to compensate MDLZ's customers in the form of refunds or credits for Recalled RITZ that needed to be destroyed or returned as well as other RITZ products that customers removed from their shelves as a result of the recall; (c) fines or fees to customers for failing to supply product under the terms of MDLZ's contracts with its customers, intended to compensate for costs the customer incurred in connection with the recall; (d) costs incurred in implementing the recall, including the costs to collect the Recalled RITZ from store shelves nationwide, and to ship, store, and destroy the Recalled RITZ; (e) lost profits; (f) costs incurred to restore consumer confidence in the RITZ brand as a whole, including increased advertising, marketing, and public relations costs; and (g) damage to MDLZ's reputation and customer and consumer goodwill.

**COUNT II**
**Breach of Implied Warranty of Merchantability (U.C.C. § 2-314)**

74. MDLZ repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

75. The whey powder was sold to MDLZ and HFS by AMPI, which is a merchant of goods of that kind.

76. The whey powder was not of merchantable quality because AMPI expressly instructed MDLZ and HFS not to use the whey powder due to Salmonella contamination. AMPI thereby breached the implied warranty of merchantability because, among other things, the whey powder (a) would not pass without objection in the trade under the contract description; (b) was not of fair average quality within the contract description; (c) was not fit for the ordinary purposes for which whey powder is used; (d) did not run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) did not conform to the promises or affirmations of fact made by AMPI in connection with the sale.

77. AMPI either extended the implied warranty of merchantability directly to MDLZ in connection with their agreements on quality matters or, alternatively, MDLZ is a third-party beneficiary of the implied warranties in any contract between AMPI and HFS for the sale of whey powder to be used in MDLZ's products because AMPI entered into these contracts knowing and intending that the whey powder it supplied to HFS would be used in products HFS was manufacturing for MDLZ.

78. AMPI knew that the whey powder it supplied to HFS was being used in MDLZ's consumer food products. AMPI also knew MDLZ's requirements for whey powder, as set forth in the MDLZ specification and MDLZ's SQE Manual. And AMPI manufactured and delivered the whey powder specifically to meet those requirements.

79. AMPI notified MDLZ of the defects in its whey powder and its recall, and MDLZ

19

promptly notified AMPI that the recall had resulted in significant damages.

80. As a direct and proximate result of AMPI's breach of the implied warranty of merchantability, MDLZ suffered significant damage, including but not limited to the damages associated with a nationwide recall to remove affected products. These damages include at least the following: (a) the loss of damaged product that was still in MDLZ's plants and warehouses; (b) costs incurred to compensate MDLZ's customers in the form of refunds or credits for Recalled RITZ that needed to be destroyed or returned as well as other RITZ products that customers removed from their shelves as a result of the recall; (c) fines or fees to customers for failing to supply product under the terms of MDLZ's contracts with its customers, intended to compensate for costs the customer incurred in connection with the recall; (d) costs incurred in implementing the recall, including the costs to collect the Recalled RITZ from store shelves nationwide, and to ship, store, and destroy the Recalled RITZ; (e) lost profits; (f) costs incurred to restore consumer confidence in the RITZ brand as a whole, including increased advertising, marketing, and public relations costs; and (g) damage to MDLZ's reputation and customer and consumer goodwill.

## COUNT III
### Breach of Implied Warranty of Fitness for a Particular Purpose (U.C.C. § 2-315)

81. MDLZ repeats and realleges paragraphs 1 through 80 as if fully set forth herein.

82. At the time of contracting, AMPI had reason to know that its whey powder would be used as an ingredient in MDLZ's products, which were intended for sale and human consumption.

83. At the time of contracting, AMPI had reason to know MDLZ relied on AMPI's skill and judgment to furnish whey powder that would be suitable for use in MDLZ's products, which were intended for sale and human consumption.

84. The whey powder AMPI provided was not fit for the purpose of being incorporated

into consumer food products intended for sale and human consumption. AMPI expressly instructed MDLZ and HFS not to use the recalled whey powder. As a result, AMPI breached the implied warranty of fitness for a particular purpose.

85.     AMPI either extended the implied warranty of fitness for a particular purpose directly to MDLZ in connection with their agreements on quality matters or, alternatively, MDLZ is a third-party beneficiary of the implied warranties in any contract between AMPI and HFS for the sale of whey powder to be used in MDLZ's products because AMPI entered into these contracts knowing and intending that the whey powder it supplied to HFS would be used in products HFS was manufacturing for MDLZ.

86.     AMPI knew that the whey powder it supplied to HFS was being used in MDLZ's consumer food products. AMPI also knew MDLZ's requirements for whey powder, as set forth in the MDLZ specification and MDLZ's SQE Manual. And AMPI manufactured and delivered the whey powder specifically to meet those requirements.

87.     AMPI notified MDLZ of the defects in its whey powder and its recall, and MDLZ promptly notified AMPI that the recall had resulted in significant damages.

88.     As a direct and proximate result of AMPI's breach of the implied warranty of fitness for a particular purpose, MDLZ suffered significant damage, including but not limited to the damages associated with a nationwide recall to remove all affected products. These damages include at least the following: (a) the loss of damaged product that was still in MDLZ's plants and warehouses; (b) costs incurred to compensate MDLZ's customers in the form of refunds or credits for Recalled RITZ that needed to be destroyed or returned as well as other RITZ products that customers removed from their shelves as a result of the recall; (c) fines or fees to customers for failing to supply product under the terms of MDLZ's contracts with its customers, intended to

compensate for costs the customer incurred in connection with the recall; (d) costs incurred in implementing the recall, including the costs to collect the Recalled RITZ from store shelves nationwide, and to ship, store, and destroy the Recalled RITZ; (e) lost profits; (f) costs incurred to restore consumer confidence in the RITZ brand as a whole, including increased advertising, marketing, and public relations costs; and (g) damage to MDLZ's reputation and customer and consumer goodwill.

## COUNT IV
## Breach of Contract

89.     MDLZ repeats and realleges paragraphs 1 through 88 as if fully set forth herein.

90.     MDLZ and AMPI had a contract pursuant to which AMPI was to supply whey powder ordered by MDLZ and MDLZ's external manufacturers meeting MDLZ's specifications and quality standards and at prices set by MDLZ and AMPI.

91.     As reflected in purchase orders issued by MDLZ and HFS to AMPI, AMPI contracted with MDLZ and HFS to supply whey powder for use in MDLZ's products.

92.     In connection with AMPI's recall, AMPI failed to fill certain orders for the purchase of whey powder that had been placed by MDLZ and accepted by AMPI.

93.     In addition, AMPI failed to fill certain orders for the purchase of whey powder for use in MDLZ's products that had been placed by HFS and accepted by AMPI.

94.     As a result, MDLZ incurred damages in connection with purchasing whey powder to substitute for the whey powder that AMPI did not deliver pursuant to MDLZ's and HFS's purchase orders.

## COUNT V
### Express Indemnification

95.     MDLZ repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

96.     Paragraph 6 of MDLZ's terms and conditions provides that AMPI will indemnify MDLZ for "any and all losses, damages, fines, penalties, and expenses (including reasonable legal fees) arising from third party claims resulting from actual or alleged breaches of this PO, negligent acts or omissions, or willful misconduct by [AMPI] or [AMPI's] employees, agents, or subcontractors."  (Exhibit 1 ¶ 6.)

97.     MDLZ suffered such losses arising from third party claims, including in the form of fees MDLZ was required to pay to its customers for failing to supply RITZ product under the terms of MDLZ's contracts with its customers, and in the form of refunds or credits MDLZ provided to its customers to compensate for Recalled RITZ that had been purchased by those customers but needed to be destroyed or returned as a result of the recall.

98.     Pursuant to AMPI's express indemnification obligation in MDLZ's terms and conditions, AMPI is obligated to compensate MDLZ for the damages arising from these third party claims.

99.     In addition, Paragraph 11 of HFS's terms and conditions provides that AMPI "agrees to indemnify and hold harmless [HFS] *and [HFS's] customers* from any and all claim, demands, damages or other injuries to persons or property in any way arising out of or resulting from the storage, purchase, consumption or use of goods covered by this [purchase] order." (Exhibit 4 ¶ 11 (emphasis added)).

100.    The express indemnification provision in Paragraph 11 of HFS's terms and conditions either extends directly to MDLZ because MDLZ is one of "[HFS's] customers" or, alternatively, MDLZ is a third-party beneficiary of any contract between AMPI and HFS for the

sale of whey powder to be used in MDLZ's products because AMPI entered into these contracts knowing and intending that the whey powder it supplied to HFS would be used in products HFS was manufacturing for MDLZ.

101.    MDLZ suffered damages and injury to property arising out of and/or resulting from HFS's purchase and use of the whey powder covered by its purchase orders with AMPI.

102.    Pursuant to AMPI's express indemnification obligation in HFS's terms and conditions, AMPI is obligated to compensate MDLZ for the damages MDLZ incurred arising out of and/or resulting from HFS's purchase and use of whey powder from AMPI that was defective and needed to be recalled.  These damages include at least the following: (a) the loss of damaged product that was still in MDLZ's plants and warehouses; (b) costs incurred to compensate MDLZ's customers in the form of refunds or credits for Recalled RITZ that needed to be destroyed or returned as well as other RITZ products that customers removed from their shelves as a result of the recall; (c) fines or fees to customers for failing to supply product under the terms of MDLZ's contracts with its customers, intended to compensate for costs the customer incurred in connection with the recall; (d) costs incurred in implementing the recall, including the costs to collect the Recalled RITZ from store shelves nationwide, and to ship, store, and destroy the Recalled RITZ; (e) lost profits; (f) costs incurred to restore consumer confidence in the RITZ brand as a whole, including increased advertising, marketing, and public relations costs; and (g) damage to MDLZ's reputation and customer and consumer goodwill.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mondelēz Global LLC prays that judgment be entered against Defendant Associated Milk Producers Inc., and that this Court direct Defendant to: (1) pay MDLZ direct, consequential, and incidental damages; (2) pay the costs of this action, including reasonable

24

attorneys' fees incurred herein; and (3) for such other and further relief as this Court deems equitable and just.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of all claims triable to a jury.

Dated: November 2, 2020

Respectfully submitted,

MONDELĒZ GLOBAL LLC

By: _/s/ Dean N. Panos_
     One of its attorneys

Dean N. Panos
Christopher Tompkins
Joshua M. Levin
JENNER & BLOCK, LLP
353 North Clark Street
Chicago, Illinois 60654-3456

Tel: (312) 222-9350